**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

**Plaintiff,**

**v.**

**NICOLE FLORIS AND BRADLEY BENAVIDES,**

**Defendants.**

**No. 26-mj-00185**

# MEMORANDUM OPINION

"§ 1001 prosecutions can pose a risk of abuse and injustice. In part, that's because § 1001 applies to virtually any statement an individual makes to virtually any federal government official—even when the individual making the statement is not under oath." *United States v. Moore*, 612 F.3d 698, 703 (D.C. Cir. 2010) (Kavanaugh, J., concurring). This risk is most acute when the government weaponizes § 1001 prosecutions against its perceived enemies.

This risk is not theoretical. It is an unprecedented reality now before this Court. At the behest of the President of the United States and the Director of the FBI, the government rushed to charge Nicole Floris and Bradley Benavides—two decorated former FBI officials—of lying to Congress years ago about their knowledge of mundane facts associated with Hunter Biden's laptop in violation of § 1001(a)(2). But the government is not free to use this weapon unchecked. The rule of law is still a shield against it. And that shield is in the hands of grand juries and courts.

Because the government was unwilling or unable to obtain a grand jury indictment, the rules required the government to establish probable cause in a preliminary hearing that Ms. Floris

and Mr. Benavides had violated § 1001(a)(2). The government failed this simple task. Accordingly, this case is dismissed.

## I. BACKGROUND

Ms. Floris and Mr. Benavides spent years protecting our country. *See* Oct. 27, 2026, Hr'g Tr. 107:25–109:9; *see also* Oct. 28, 2026, Hr'g Tr. 161:25–162:7. The Court will not recount the lengthy details of their public service. Suffice it to say, their sacrifices are profound and their accomplishments are undeniable. *See* Oct. 27, 2026, Hr'g Tr. 107:25–109:9; *see also* Oct. 28, 2026, Hr'g Tr. 161:25–162:7.

### A. Timeline of the Instant Case

Ms. Floris served as the Deputy Assistant Director and "functional head" of the Foreign Influence Task Force ("FITF") from mid-2019 through mid-2022. Statement of Facts ¶ 6, ECF. No. 2-1. Mr. Benavides served as the Section Chief of the FITF from mid-2019 through the 2020 election. *See id.* Under FBI Director Wray, the FBI's FITF evolved into a broader effort to combat foreign influence by nation-state actors and to "secur[e] the 2020 election from foreign malign actors." *Id.* As part of their work, Ms. Floris and Mr. Benavides were sending and receiving hundreds of thousands of messages. *See* Oct. 27, 2026, Hr'g Tr. 104:17–23; Oct. 28, 2026, Hr'g Tr. 59:1–60:10.

On August 6, 2020, Ms. Floris and Mr. Benavides provided defensive briefings to Senators Grassley and Johnson. *See* Statement of Facts ¶ 24. The Senators believed the briefings were an effort by Democratic representatives to discredit Senators Grassley and Johnson. *See* Benavides Ex. 2, Aug. 25, 2022 Letter; *see also* Gov't Ex. 4, Press Release; Benavides Ex. 3, Rep. Jim Jordan Letter to Mr. Benavides.

In 2023, the U.S. House of Representatives Committee on the Judiciary ("HJC") invited Ms. Floris and Mr. Benavides for interviews. *See* Floris Ex. 1 ("Floris Tr.") 3:2–4 (July 19, 2023); Benavides Ex. 1 ("Benavides Tr.") 3:1–4 (Sep. 28, 2023). Both Ms. Floris and Mr. Benavides agreed to voluntarily testify. *See* Floris Tr. 3:15–17; Benavides Tr. 3:7–9. This testimony was not under oath. *See* Floris Tr. 4:3–6:3; Benavides Tr. 5:18–25. However, Ms. Floris and Mr. Benavides affirmed their understanding that any false testimony could lead to prosecution. *See* Floris Tr. 5:13–16; Benavides Tr. 6:1–5. The winding line of questioning led to inquiries about the FBI's handling of Hunter Biden's laptop. Ms. Floris' and Mr. Benavides' answers were left unquestioned for years.

That is until July 16, 2026. That evening, President Trump directed the FBI during a national address to investigate and charge FBI staff over perceived slights related to the 2020 election. *See* Oct. 27, 2026, Hr'g Tr. 123:17–125:7. On July 17, 2026, FBI Director Kash Patel ordered the Kansas City FBI to investigate Ms. Floris and others for obstruction or conspiracy charges. *See id.* at 120:5–25, 123:17–124:12.

Matt Price, the U.S. Attorney for the Western District of Missouri, and the Special Agent in Charge of the Kansas City FBI office selected Special Agent Witt ("SA Witt") as one of the case agents for the investigation. SA Witt testified that this was an abnormal assignment process unlike anything he had otherwise experienced in his career. *See id.* at 121:3–10. Indeed, SA Witt "did not ask to be on this investigation" and was concerned that it would be perceived as "political." *Id.* at 115:17–22; 123:11–13. Pressure to "aggressively" work the investigation and a push to charge the case came from the highest levels, including Director Patel. *Id.* at 132:9–133:2.

SA Witt was unable to adequately investigate the case. For example, SA Witt was precluded from interviewing Ms. Floris and Mr. Benavides. SA Witt conceded that such interviews would have been "helpful" and "absolutely valuable" in "understand[ing] [their] mindset and [their]

understanding [of the questions by Congressmembers].” Oct. 28, 2026, Hr’g Tr. 142:9–25. As another example, he was unable to directly interview the staffers on the HJC majority staff. Instead, he and the prosecutors crafted eight questions (“the Questionnaire”) that went to Mr. Castor, the politically appointed general counsel for the Republican majority. The Questionnaire sought firsthand knowledge from the majority staffers about the impact of Ms. Floris’ and Mr. Benavides’ testimony. This turned out to create major problems for the case. *See, e.g.*, Oct. 29, 2026, Hr’g Tr. 16:9–16. SA Witt testified that he would also have wanted to interview the minority staffers—which would have given him a fuller picture and help dispel allegations of political bias—but he did not do so. *See* Oct. 28, 2026, Hr’g Tr. 228:6–230:13.

B. Procedural History

Regardless, the government forged ahead with charging the case. On October 16, 2026, the government submitted a criminal complaint charging Ms. Floris and Mr. Benavides with making false statements to Congress in violation of 18 U.S.C. § 1001(a)(2). *See* Compl. 1, ECF No. 2. The Complaint’s statement of facts includes snippets of emails, calendar invitations, and instant messages to demonstrate that Ms. Floris and Mr. Benavides made false statements about the FBI’s investigation into Hunter Biden’s laptop. *See* Statement of Facts ¶¶ 3, 6–22. The statement of facts also includes answers to the Questionnaire from Mr. Castor to establish materiality. *See* Statement of Facts ¶ 41.

On October 20, 2026, SA Witt’s co-case agent swore out the sealed Complaint. *See* Sealed Compl. 1, ECF No. 1. On October 23, 2026, the undersigned held an initial appearance. *See* Min. Entry (Oct. 23, 2026). The government agreed that it was unnecessary for the Court to impose *any* conditions of release. Ms. Floris and Mr. Benavides requested a preliminary hearing on the next business day, October 26, 2026. The government objected and requested 14 to 21 days. The Court

overruled the government's objection. The Court set the preliminary hearing for October 27, 2026, two business days out, to which Ms. Floris and Mr. Benavides consented.[1]

After the hearing, the U.S. Marshal Service returned the arrest warrants. *See* Arrest Warrant Returned for Nicole Floris 1, ECF No. 11; Arrest Warrant Returned for Bradley Benavides 1, ECF No. 12. This entailed Ms. Floris and Mr. Benavides going to the jail cell at the courthouse where law enforcement took their mugshots, copied their fingerprints, and obtained certain biographical information.

On October 27, 2026, at 12:43 a.m., the government emailed a "Superseding Complaint" to the defendants and the Court. The government filed on the public docket this unsigned, unsworn "Superseding Complaint." This document added an additional charge against Ms. Floris and Mr. Benavides and made "correction[s]" and "clarification[s]" to inaccurate statements in the original Complaint. Oct. 27, 2026, Hr'g Tr. 37:16–39:24; *see* Notice of Filing Superseding Criminal Compl., ECF No. 16. Ms. Floris and Mr. Benavides immediately filed a request to strike this document from the record. *See* Motion to Strike, ECF No. 18; *see also* Oct. 27, 2026, Hr'g Tr. 14:18–24.

---

[1] Rule 5.1 of the Rules of Criminal Procedure states that "[t]he magistrate judge must hold the preliminary hearing within a reasonable time, but no later than 14 days after the initial appearance if the defendant is in custody and no later than 21 days if not in custody." The government reads this as an automatic continuance of 14 or 21 days. That is incorrect. The Rule's requirement is for the hearing to be within a reasonable time. The two deadlines act as a ceiling, not a basement, on what is reasonable. Because this case involved conduct that was years old, for which the government had ample time to prepare for a hearing on, and which had major consequences on Ms. Floris' and Mr. Benavides' livelihoods, the reasonable time was right away. On top of that, "the government failed to provide any reason that made a continuance proper." *United States v. McLean*, 749 F. Supp. 3d 167, 177 (D.D.C. 2024) (rejecting government's interpretation of Bail Reform Act to grant automatic 3-day continuance from initial appearance to detention hearing).

On October 27, 2026, the undersigned struck the "Superseding Complaint" from the record and held any determination about the new charge in abeyance pending the outcome of the preliminary hearing. *See* Oct. 27, 2026, Hr'g Tr. 30:9–31:10; 39:21–40:7.[2]

The preliminary hearing took three days. *See* Min. Entries (Oct. 27, 2026, Oct. 28, 2026, and Oct. 29, 2026). On direct, SA Witt adopted the affidavit in support of the "Superseding Complaint" as his testimony. SA Witt then clarified the mistakes the "Superseding Complaint" corrected from the Complaint. SA Witt was subject to cross-examination by defense counsel and re-direct by the government. On October 29, 2026, the parties presented argument. On November 2, 2026, the Court issued an oral decision. This opinion memorializes the basis for that decision.

C. Timeline of Related Events

Context matters. For that reason, we must contextualize what else was happening with the principals in this matter.

- Mid-2019 – Ms. Floris led FITF as Deputy Assistant Director and Mr. Benavides became FITF Section Chief. *See* Statement of Facts ¶ 6.

- Late-2019 – FBI's Baltimore office was investigating Hunter Biden for tax and money-laundering offenses. *See id.* ¶ 3.

---

[2] To begin with, the government's last minute amendment before the preliminary hearing was problematic. Far more troubling was their decision to publicly allege a felony violation without any finding by a court or grand jury. The government has *never* before charged someone this way. The career prosecutor conceded that. *See* Oct. 27, 2026, Hr'g Tr. 16:3–19:7. Further evidence that the irregular is now the regular when it comes to the government.

Publishing an unsworn complaint violates a core principle of our criminal justice system—that an independent party must first verify that there is probable cause to support a felony accusation—and infringes on the rights of the accused. Indeed, without grand juries and judges acting as an independent check, nothing could stop a prosecutor from weaponizing the system: anyone could face criminal charges based on a hunch, a grudge, or political pressure. Dragging a person through a nightmarish legal system where accusations are treated as proof is Kafkaesque, not American.

- August 2019 – Senators Grassley and Johnson opened an investigation "into potential conflicts of interest arising from the foreign business ventures of the family of then-Presidential candidate Joe Biden." *Id.* ¶ 23.

- December 9, 2019 – FBI Baltimore obtained the contents of Hunter Biden's laptop from a computer repair shop and searched it as part of its investigation. *See id.* ¶ 4.

- **August 6, 2020 – Defensive briefing provided to Senators Grassley and Johnson which the senators indicated was an effort to discredit them.** *See id.* ¶ 24; *see also* Benavides Ex. 2, Aug. 25, 2022 Letter; Gov't Ex. 4, Press Release; Benavides Ex. 3, Rep. Jim Jordan Letter to Mr. Benavides.

- September 23, 2020 – Senators Grassley and Johnson published their "Report on Conflicts-of-Interest Investigation." Statement of Facts ¶ 12.

- September 23, 2020 – Ms. Floris circulated the report written by Senators Grassley and Johnson. *See id.*

- October 14, 2020 – New York Post published a story related to Hunter Biden's laptop. *See id.* ¶ 14.

- November 2020 – Mr. Benavides departed FITF. *See id.* ¶ 21.

- January 2021 – Transition to President Biden's administration.

- May/June 2022 – Ms. Floris departed FITF. *See* Floris Tr. 10:25–11:2.

- July 27, 2022 – Senator Johnson stated that the "FBI can no longer be trusted to investigate Hunter Biden with integrity and the equal application of law." Ron Johnson, *Sen. Johnson: Whistleblower Allegations Reveal Corrupt FBI Undermined Hunter Biden Investigations*, U.S. Senator Ron Johnson (July 27, 2022), https://perma.cc/56ZV-9B8G.

- June 2022 – Mr. Benavides departed FBI. *See* Oct. 27, 2026, Hr'g Tr. 90:11–13.

- August 25, 2022 – Senator Johnson stated that "the FBI cannot be trusted with the handling of Hunter Biden's laptop." Newsweek, *FBI Can't 'Be Trusted' to Investigate Hunter Biden's Laptop: Ron Johnson* (Aug. 25, 2022), https://perma.cc/2NE9-MYLM.

- October 20, 2022 – Senator Grassley stated "we just have to keep pursuing [information about Hunter Biden], and I intend to keep pursuing it." He also stated that he "want[ed] the Justice Department, the FBI, to know that we know these documents exist" and that he intends to "keep the heat on until I get answers." Fox News, *Grassley vows to keep 'heat' on FBI over Hunter Biden: 'We have to follow the money and I want answers* (Oct. 20, 2022), https://perma.cc/4LAJ-TZ2H.

- January 29, 2023 – Representative Jordan accused the FBI of widespread corruption. *See* NBC News, *Meet the Press – January 29, 2023* (Jan. 29, 2023), https://perma.cc/WL7F-XE4S.

- February 8, 2023 – Representative Jordan criticized the FBI for how they handled Hunter Biden laptop. He stated: "You know, who knew the laptop was real? It was the FBI. They had it for, or maybe they had it for a year and just said, you know what, we are going to put it on the shelf, we are not going to look at it, but if anyone knows it is real, it is them . . . [m]aybe they could have checked with the FBI because the FBI had the actual laptop in their possession." *Protecting Speech from Government Interference and Social Media Bias, Part I: Twitter's Role in Suppressing the Biden Laptop Story*, 118th Cong. 1 (2023) (statement of Rep. Jim Jordan, H. Comm. on Oversight & Accountability), https://perma.cc/KE9V-L9NS.

- May 18, 2023 – Representative Jordan stated that "the leadership of the FBI and the DOJ are corrupt." He further stated, "[w]hat I think we can say is that as the DOJ and FBI have become more political, they have amassed more power. As they have amassed more power, they have become more political. This is a vicious cycle that must be stopped." *The Weaponization of the Federal Government: Hearing Before the H. Select Subcomm. on the Weaponization of the Federal Government*, 118th Cong. 1 (2023) (statement of Rep. Jordan, Chairman, H. Select Subcomm. on the Weaponization of the Federal Government), https://perma.cc/MG6L-3LBB.

- **July 19, 2023 – Ms. Floris gives voluntary testimony**. Mr. Castor was present at this hearing. *See* Floris Tr. 3:25.

- June 21, 2023 – In response to Hunter Biden's plea deal, Senator Grassley stated that this "cannot be the final word given the significant body of evidence that the FBI and Justice Department have at their disposal. *It certainly won't be for me*." Chuck Grassley, *Grassley: Hunter Plea Deal Can't Be Final Word*, U.S. Senator Chuck Grassley (June 20, 2023), https://perma.cc/E9L5-L8YP (emphasis added).

- **September 28, 2023 – Mr. Benavides gives voluntary testimony.** Mr. Castor was not present at this hearing. *See* Benavides Tr. 3:1–21; *see also* Oct. 28, 2026, Hr'g Tr. 221:13–18.

- December 11, 2023 – Senator Johnson publishes an OpEd titled "Do Not Feel Sorry for Hunter Biden" where he calls Hunter Biden a "criminal" who engaged in vile acts. Ron Johnson, *Do Not Feel Sorry for Hunter Biden*, U.S. Senator Ron Johnson (Dec. 11, 2023), https://perma.cc/9Y42-8SMM.

- February 6, 2024 – HJC filed a 46-page lawsuit against FBI Assistant Special Agent in Charge Elvis Chan for refusing to comply with a congressional subpoena about his work at FITF and his firsthand knowledge of the FBI's actions regarding the 2020 New York Post stories about Hunter Biden's laptop. *See* Compl., *Comm. on the Judiciary v. Elvis Chan*, No. 24-cv-344 (D.D.C. Feb. 6, 2024), ECF No. 1.

- September 25, 2024 – Representative Jordan accuses FBI of being "driven by politics today" in his opening remarks about the weaponization of the federal government. *The Weaponization of the Federal Government: Hearing Before the H. Select Subcomm. on the Weaponization of the Federal Government*, 118th Cong. 2 (2024) (statement of Rep. Jordan, Chairman, H. Select Subcomm. on the Weaponization of the Federal Government).

- December 1, 2024 – Hunter Biden pardoned. *See* AP News, *Biden pardons his son Hunter despite previous pledges not to* (Dec. 2, 2024), https://perma.cc/XF38-FG5D.

- February 10, 2025 – Joint Statement by Senator Grassley and Representative Jordan that "political infection has saturated the DOJ and FBI in recent years." Both raised concerns about "the FBI's [FITF] engaging in political influence, rampant whistleblower retaliation and other politically-infected conduct by the DOJ and FBI." Chuck Grassley, *Grassley-Jordan Statement on Efforts to Eliminate DOJ Weaponization*, U.S. Senator Chuck Grassley (Feb. 10, 2025), https://perma.cc/JV2C-4RBX.

- July 16, 2026 – President Trump declassified documents related to the 2020 election. He then called on the FBI to investigate "how and why such crucial information was hidden" from him and to prosecute the people responsible for the alleged cover up. Politico, *Trump rails against election systems – and familiar enemies* (July 16, 2026), https://perma.cc/KA2C-YZUY.

- July 17, 2026 – Director Patel assigned the case to the Kansas City FBI office. *See* Oct. 27, 2026, Hr'g Tr. 112:20–113:1.

- September 2, 2026 – Representative Jordan sent a letter to Director Patel demanding information and documents regarding the FBI's 2020 counterintelligence operation known as Round River, which was part of the FITF's work to counter foreign influence. The FBI has compiled tens of thousands of pages in response to this request. *See* H. Judiciary Comm., *Jim Jordan demands FBI Round River docs after memos reveal targeting of Trump officials, allies* (Sep. 2, 2026), https://perma.cc/H7PX-HULJ.

- October 2, 2026 – Prosecution team sent eight hypothetical question to Mr. Castor to establish materiality. *See* Oct. 28, 2026, Hr'g Tr. 165:2–11; Oct. 29, 2026, Hr'g Tr. 13:25–14:8.

- October 14, 2026 – SA Witt received 6-page response (i.e., the "Castor Letter") from Mr. Castor. *See* Oct. 29, 2026, Hr'g Tr. 13:25–14:8.

- October 16, 2026 – U.S. Attorney's Office submits Complaint to Judge Sharbaugh. *See* Oct. 27, 2026, Hr'g Tr. 148:14–22.

- October 20, 2026 – Complaint is sworn out by Judge Sharbaugh. *See* Sealed Compl. at 1.

- October 26, 2026 – SA Witt and U.S. Attorney's Office have call with Mr. Castor after the team realizes that the Complaint incorrectly stated that the investigation had drawn information from a staffer who was present at Mr. Benavides' interview. U.S. Attorney's Office staff state that: I have one issue that "I am getting hammered on over here." "I understand that it is our fuckup" and I am "[l]ooking for some assistance here" and the challenge is that "[o]ur career prosecutors are completely adamant that they need to speak with one of the five officials that was in the Benavides transcript – transcribed interview." Oct. 29, 2026, Hr'g Tr. 11:1–17, 15:15–19.

- October 27, 2026 – At 12:43 am U.S. Attorney's Office files a "Superseding Complaint" which the Court had not authorized to clean up the mistakes in the Complaint. *See* Notice of Filing Superseding Compl.

- November 3, 2026 – U.S. midterm elections.

## II. LEGAL STANDARD

### A. Preliminary Hearing

The function of a preliminary hearing is to determine "whether probable cause exists to hold the accused for trial." *Coleman v. Burnett*, 477 F.2d 1187, 1201 (D.C. Cir. 1973). "It has generally been thought that the purpose of a preliminary hearing is to afford the accused (1) an opportunity to establish that there is no probable cause for his continued detention and thereby to regain his liberty and, possibly, escape prosecution, and (2) a chance to learn in advance of trial the foundations of the charge and the evidence that will comprise the government's case against him." *Blue v. United States*, 342 F.2d 894, 901 (D.C. Cir. 1964); *see United States v. Hinkle*, 307 F. Supp. 117, 121 (D.D.C 1969) (same). "The preliminary hearing is not a minitrial of the issue of guilt, but is rather an investigation into the reasonableness of the bases for the charge." *Coleman v. Burnett*, 477 F.2d at 1201. Rule 5.1 of the Federal Rules of Criminal Procedure "calls for the Court to dismiss the Complaint and discharge Defendant if, at the preliminary hearing, the undersigned finds 'no probable cause to believe an offense has been committed or [Defendant] committed it.'" *United States v. Wilson*, 217 F. Supp. 3d 165, 172 (D.D.C. 2016); *see* Fed. R. Crim. P. 5.1(f).

B. Probable Cause

Probable cause means that "there is a fair probability" that the named individual committed the named offense. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A probable cause determination is a "practical, common-sense decision" that requires consideration of "the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Id.* The warrant application and attached affidavit "must provide the magistrate [judge] with a substantial basis for determining the existence of probable cause." *Id.* at 239. "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Instances where the provided affidavit is "wholly conclusory," without evidence to support the conclusions, *Gates*, 462 U.S. at 239*,* and instances where the affidavit "contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein," is not enough to support a finding of probable cause. *Aguilar v. Texas*, 378 U.S. 108, 113 (1964). As such, a warrant application must include more than "bare bones" allegations. *Gates*, 462 U.S. at 239.

It is crucial for Magistrate Judges to "perform [their] 'neutral and detached' function and not serve merely as a rubber stamp for the police[,]" when making a probable cause determination. *United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *Aguilar*, 378 U.S. at 111). "To determine whether [there is] probable cause to believe [an individual is] violating [the] law, we look to [the] law to identify the elements of each of those offenses." *Wesby v. District of Columbia*, 765 F.3d 13, 19 (D.C. Cir. 2014). "[T]here must be probable cause for all elements of the crime, including *mens rea*." *United States v. [Redacted]*, 806 F. Supp. 3d 17, 23 (D.D.C. 2025) (quoting *Williams v. City of Alexander*, 772 F.3d 1307, 1312 (8th Cir. 2014)).

C. Violation of 18 U.S.C. § 1001(a)(2)

"[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully – makes any materially false, fictitious, or fraudulent statement or representation" violates 18 U.S.C. § 1001(a)(2). The elements of a § 1001(a)(2) violation are: "(1) [the defendant(s)] made a statement; (2) the statement was false, fictitious or fraudulent, as [they] knew; (3) the statement was made knowingly and willfully; (4) the statement was made in a matter within the jurisdiction of a federal agency; and (5) the statement was material." *United States v. Tao*, 107 F.4th 1179, 1184 (10th Cir. 2024) (cleaned up).

*1. Falsity*

"For a statement to be criminal under 18 U.S.C. § 1001, it must be [] 'false, fictitious, or fraudulent.'" *United States v. Sussmann*, 598 F. Supp. 3d 1, 2 (D.D.C. 2022). "[A] defendant cannot as a matter of law be convicted of [making false statements] on the basis of an answer to a question that is 'excessively vague' or 'fundamentally ambiguous.'" *United States v. Naegele*, 341 B.R. 349, 355 (D.D.C. 2006) (citing *United States v. Culliton*, 328 F.3d 1074, 1078 (9th Cir. 2003)); *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986); *United States v. Lattimore*, 127 F. Supp. 405, 413 (D.D.C.), *aff'd* 232 F.2d 334 (D.C. Cir. 1955). "A question is 'fundamentally ambiguous' when it 'is not a phrase with a meaning about which [people] of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *Naegele*, 341 B.R. 349, 355 (quoting *Lattimore*, 127 F. Supp. at 410). When considering fundamental ambiguity, "the Court may not consider the question in isolation, but must look to the context of the question and the answer, as well as other extrinsic evidence relevant to [the defendant's] understanding of the

questions posed." *Naegele*, 341 B.R. 349, 356 (cleaned up). Additionally, "[t]he defense of literal truth applies to section 1001 prosecutions." *United States v. Milton*, 8 F.3d 39, 45 & n.7 (D.C. Cir. 1993). As such, "[t]he burden is on the *questioner* to pin the witness down to the specific object of the questioner's inquiry." *Bronston v. United States*, 409 U.S. 352, 360 (1973) (emphasis added). A questioner's failure has fatal effects. "In the face of ambiguity, a court may decide as a matter of law to dismiss an indictment [or complaint] so long as the defendant offers an innocent explanation for his testimony." *Culliton*, 328 F.3d at 1080.

*2. Knowingly*

"To establish a violation of § 1001, the Government must prove beyond a reasonable doubt that the statement was made with knowledge of its falsity." *United States v. Yermian*, 468 U.S. 63, 64 (1984). To show that the defendants "knowingly" made a false declaration, the government must demonstrate that the defendants were "aware" that the statements were false when they were made. *United States v. Michel*, No. 19-cr-148-1, 2019 WL 5797669, at *2, *14–15 (D.D.C. Nov. 6, 2019). The government must "establish, among other things, that the defendant[s] acted with specific intent." *United States v. Libby*, 429 F. Supp. 2d 1, 12 (D.D.C. 2006). "Accordingly, these charges could possibly be defeated by the defendant demonstrating that the alleged misstatements were not made intentionally, but were merely the result of confusion, mistake, faulty memory, or another innocent reason." *Id.* The statements must be considered in light of the fact that "it is a well known fact that human memory has its frailties and that recollection of exact dates of events that transpired many years previously is apt to be inaccurate and unreliable." *Schering Corp. v. Marzall*, 101 F. Supp. 571, 573 (D.D.C 1951). Indeed, the government's own witness put it best: SA Witt testified that his own incorrect sworn testimony was "not an intentionally false statement" and that making a criminal false statement required an intent to deceive. Oct. 27, 2026, Hr'g Tr.

84:17–85:1.

Establishing "the defendant's motive for making the false statements is not technically part of the prosecution's burden." *United States v. Petrillo*, No. 15-cr-192-1, 2016 WL 4444726, at *2 (D.N.H. Aug. 23, 2016) (citation omitted). But courts frequently look for a motive. *See, e.g.*, *id.*; *United States v. Mestchersky*, 411 F.2d 610, 611 (2d Cir. 1969) (court properly admitted evidence of "motive for the allegedly false statement"). This is because motive is "extrinsic evidence that demonstrates how a declarant interpreted a question." *Lighte*, 782 F.2d at 373 (citing *United States v. Chapin*, 515 F.2d 1274, 1280–81 (D.C. Cir. 1975). And that speaks directly to the knowingly element. Put another way, "proof of a motive to falsify, often may serve to [establish] . . . criminal intent." *Lighte*, 782 F.2d at 373.

The government typically establishes motive through "circumstantial evidence." *Id.* Indeed, "[false statement] cases, like all criminal cases, are susceptible to proof by circumstantial evidence, and in fact are peculiarly likely to be proven in this manner because one of the elements of the crime is that the defendant knew his statement was false when he made it." *Chapin*, 515 F.2d at 1280. Applying this language from *Chapin*, the First Circuit gave considerable weight to the appellant's motive to lie when upholding a false statement conviction. *See United States v. Reveron Martinez*, 836 F.2d 684, 689–90 (1st Cir. 1988) (quoting *Chapin*, 515 F.2d at 1278 [sic]).

*3. Materiality*

A false statement is material if it has "a natural tendency to influence, or [be] capable of influencing, the decision of the decision-making body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995). "[U]nder the objective materiality test, there must still be an actual decision at issue before the agency—a decision that the statement, once made, has the *capability* to [] influence." *Tao*, 107 F.4th at 1184–85 (cleaned up). "Deciding whether or not a

statement is material 'requires the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?'; and (b) 'what decision was the agency trying to make?'. The ultimate question: (c) 'whether the statement was material to the decision,' requires applying the legal standard of materiality . . . to these historical facts.'" *United States v. Cisneros*, 26 F. Supp. 2d 24, 40 (D.D.C. 1998). These questions are to be decided by the fact finder. *See id.* At a preliminary hearing, that is the Magistrate Judge. *See* Fed. R. Crim. P. 5.1(f). There, the Magistrate Judge performs "his or her accustomed task of determining if there is probable cause to hold a defendant to answer for the commission of an offense." *Ward v. Rutherford*, 921 F.2d 286, 287 (D.C. Cir. 1990).

It can be difficult for a fact finder to determine the impact of a false statement on the agency. *See United States v. Gaudin*, 28 F.3d 943, 950 (9th Cir. 1994), *aff'd*, 515 U.S. 506 (1995) (explaining that materiality is a "fact-bound" inquiry and that certain false statements "may be of no importance to some agency determinations but crucial to others."). Yet, there is "no requirement that the government rely on direct evidence to prove this element." *United States v. Stone*, 394 F. Supp. 3d 1, 13 (D.D.C. 2019). Instead, the fact finder "can infer from other evidence that the false statement 'was capable of affecting' the agency's functions." *Id.* (citing *United States v. Verrusio*, 762 F.3d 1, 20–21 (D.C. Cir. 2014)). Thus, a fact finder can infer materiality from circumstantial evidence. *See Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 156 (D.D.C. 2010) (recognizing that the fact finder may consider circumstantial evidence and the surrounding circumstances in evaluating the significance and materiality of an action). Demonstrating again, "[false statement] cases, like all criminal cases, are susceptible to proof by circumstantial evidence." *Chapin*, 515 F.2d at 1280.

## III. ANALYSIS

### A. Global Problems with the Investigation and the Complaint

The investigation was rushed. That is unsurprising given the unusual pressure put on the case agent. The FBI Director and Deputy Director were actively monitoring the progress of the investigation. *See* Oct. 27, 2026, Hr'g Tr. 132:13–20. SA Witt had never experienced anything like this. SA Witt's concerns about the investigation being "viewed as political" were widespread. *Id.* at 123:11–13; 127:18–128:21. His colleagues generally viewed the investigation as a witch hunt. *See id.* at 127:24–128:4.

The rushed investigation had a mandate: a rush to charge. But the rush to charge led to critical mistakes.

Let's begin with the Complaint. It contains numerous mistakes about essential facts. *See id.* at 37:12–25. For example, the Complaint alleged that a congressional staffer interviewed by the FBI was present during Mr. Benavides' hearing. *See* Statement of Facts ¶ 41. This sworn statement is false. The FBI failed to interview anyone present for Mr. Benavides' hearing. *See* Oct. 27, 2026, Hr'g Tr. 38:17–25; 80:9–82:5. As the career prosecutors noted, this was a damning mistake. *See* Oct. 29, 2026, Hr'g Tr. 11:1–17, 15:15–25. As another example, the Complaint indicated that Ms. Floris and Mr. Benavides provided sworn testimony to the HJC; however, neither defendant was under oath. *See* Oct. 27, 2026, Hr'g Tr. 84:5–16. And yet another: the government had to correct information about Employee 1. *See* Oct. 28, 2026, Hr'g Tr. 48:8–49:15. Also, the Complaint did not accurately describe certain FITF activities. *See, e.g.*, Oct. 28, 2026, Hr'g Tr. 49:16–51:16. There are other examples, but the point is made. The Complaint was error laden. These errors are particularly troubling given that a court previously found the affiant to the

Complaint to be not "sufficiently diligent" when preparing warrants. *United States v. Mejia*, No. 08-cr-1019, 2012 WL 4434367, at *3 (N.D. Ill. Sep. 24, 2012).

We next turn to the inaccuracies in SA Witt's testimony. As an example, SA Witt testified that he had "no idea" if there were Democrats on the HJC. Oct. 28, 2026, Hr'g Tr. 167:4–6. However, that was demonstrably false based on a phone call SA Witt had with Mr. Castor just days prior. *See* Oct. 29, 2026, Hr'g Tr. 12:25–13:5. As another example, SA Witt testified that Ms. Floris certified her testimony and forwent the option to amend it. *See* Oct. 28, 2026, Hr'g Tr. 74:12–75:5; 75:13–19. However, there is no evidence of that. Defense counsel showed SA Witt the certification page and the errata page for Ms. Floris' interview. *See id.* at 74:12–78:16. The certification page was blank and the errata page had a redacted signature. SA Witt then admitted that he did not know who signed the errata page and could not confirm whether Ms. Floris reviewed or signed it. *See id.* at 76:21–77:10; 78:9–16. These misstatements, although unintentional, matter. They undercut the Court's confidence in the government's evidence.

SA Witt's testimony was also rife with assumptions. He admitted that. *See, e.g.*, Oct. 27, 2026, Hr'g Tr. 91:21–25; Oct. 28, 2026, Hr'g Tr. 109:11–18; 219:25–220:2; 220:10–15. Instead of assumptions, the government should have taken the time it needed to properly investigate the case. But it did not. In fact, SA Witt conceded on multiple occasions that he could not investigate the case as he would have liked to. *See supra.*

Again, there are other examples, but the point is made. The government should have identified these errors and unfounded assumptions before hurriedly charging a three-year-old case.[3] But it did not. Apparently, there was no time to do so. This begs the question: why the rush to charge?

[3] Say perhaps at a closed-door review of the Complaint, as opposed to a public preliminary hearing.

First, let's step back and consider why the government charged via complaint. Complaints are typically utilized if a suspect presents an imminent danger, is a flight risk, there is a risk of loss of evidence, or if law enforcement has executed a warrantless arrest. But when such risks are not present, the government typically charges by indictment, that is, by the grand jury. *See United States v. Richardson*, 780 F.3d 812, 814 (7th Cir. 2015) (a criminal "complaint that charges a felony can establish a basis for an arrest warrant, justify an arrest made without a warrant, initiate, continue, or expand an investigation, and notify other law enforcement agencies of its concern with the person arrested or investigation. But unlike an indictment or information, it cannot initiate a felony prosecution.") (internal citations omitted).

After the government arrests someone by complaint, the court holds an initial appearance and detention hearing. There, the government seeks conditions of release or pretrial detention to mitigate the risks that necessitated a complaint. However, the government did not ask for any conditions of release here. This Court is unaware of any prior instance where the government charged by complaint but then sought no conditions of release. Thus, all that the Complaint did—besides allowing for press releases to malign Ms. Floris and Mr. Benavides—was put the government on a 30-day clock to return an indictment by grand jury. *See* 18 U.S.C. § 3161(b). Chief Judge Boasberg, highlighted how strange the choice to charge by complaint was here:

> So the hearing on probable cause for this complaint is taking up three days of the time of one of our busy magistrate judges. And I cannot understand why, so I'm going to let you explain it to me, [] unless this is pure political theater why the Government has proceeded via complaint in this case.

Oct. 29, 2026, Hr'g Before Chief Judge Boasberg, Rough Hr'g Tr. 3:2–7.[4]

---

[4] The government's answer was baffling. It stated that the prosecutors assigned to the case were preoccupied with the preliminary hearing and asserted that no grand jury was available. Neither answer holds water. First, there were active grand juries. In fact, the Court had to pause the

So why not just go directly to the grand jury? The answer is self-evident. The government is afraid to do so. On the one hand, this is understandable. The grand jury has refused to indict more cases in the last year than in the prior 10 years combined. As Judge McFadden noted in *United States v. Comey*, "Turns out ham sandwiches are harder to indict these days." Washington Post, *Judge Weighs Whether Justice Dept. Violated Statute in Charging James Comey* (Oct. 30, 2026), https://perma.cc/3TD4-GALP. On the other hand, it is unbelievable. The grand jury is a proceeding where the rules of evidence do not apply, no defense lawyers or judges are present, and the prosecutor has complete control of the proceeding.

Regardless of the government's fears, it cannot escape the grand jury. Before or during the preliminary hearing, the government could have—and should have—gone to the grand jury. A probable cause finding by the grand jury would have immediately cancelled the preliminary hearing and allowed the prosecution to go forward. But the government refused to do so. And even if the Court had found probable cause at the preliminary hearing, the prosecution still could not have proceeded without a grand jury returning an indictment within 30 days of the initial appearance. *See Richardson*, 780 F.3d at 814. That is the sound of inevitability.

Second, let's consider the government's timing. There was no date of legal significance looming that necessitated the urgency of a complaint. However, there was a date on the calendar that cannot be ignored: the midterm elections. The DOJ's Justice Manual expressly prohibits federal prosecutors and agents from "select[ing] the timing of any action . . . for the purpose of

---

preliminary hearing on multiple occasions to process grand jury returns. *See* Oct. 27, 2026, Hr'g Tr. 74:24–75:1; 111:2–7; *see also* Oct. 28, 2026, Hr'g Tr. 204:1–6. Ironically, one such instance involved a grand jury again refusing to indict. Second, it is preposterous to suggest that additional prosecutors were not available in a case of this import. Another agent and AUSA could have easily presented the allegations in the Complaint to a grand jury.

affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party." U.S. Dep't of Just., Just. Manual § 9-85.500 (2022).

Recent high-profile matters the government has brought in this court alone display a deliberate disregard of § 9-85.500. None more so than this case. A case about a 2020 congressional inquiry, for which false statements were allegedly made in 2023. A case which was so rushed that the investigation and Complaint were full of mistakes. A case for which was so rushed despite the fact that there were no statute of limitations problems, no need for a search warrant to preserve evidence, and no risk of flight or imminent danger to the community. The only conclusion then is that the rush to charge was to impact the looming midterm elections.

The government would have the Court ignore these facts and bury its head in the sand.[5] But doing so would be wrong. Probable cause is determined "by applying a totality-of-the-circumstances analysis," not a cherry-picked-circumstances analysis preferred by the government. *United States v. Scott*, 150 F.4th 580, 592 (D.C. Cir. 2025). The government also argues that political bias concerns can only be raised under a "selective prosecution or vindictive prosecution" motion post-indictment. Oct. 28, 2026, Hr'g Tr. 27:5–16. Wrong again. Concerns about bias are relevant to the Court's assessment of witness credibility. *See United States v. [Redacted]*, 806 F. Supp. 3d 17, 31 (D.D.C. 2025) (considering how political bias underpinned a failed attempt to establish probable cause to charge an immigrant for not listing his new mailing address). And

[5] The government objected that defense counsels' questions about bias and the rushed investigation were outside the scope of a preliminary hearing. The Court overruled this objection for two reasons. First, the Rules of Evidence do not apply at a preliminary hearing. *See* Fed. R. Evid. 1101(d). This gives the Court wide berth when probing probable cause. Second, the Court is permitted to examine the "*reasonableness* of the bases for the charge." *Coleman v. Burnett,* 477 F.2d at 1201 (emphasis added). Gathering context about the investigation and investigating bias are squarely within this remit. *See infra*.

concerns about the volume and basis of mistakes/assumptions in the affidavit are relevant to determining its viability. In sum, these concerns strike at the heart of "the 'veracity' and 'basis of knowledge'" questions in a probable cause determination. *Gates*, 462 U.S. at 238.

B. <u>The Government Failed to Establish the Elements by Probable Cause</u>

"[T]he undersigned finds 'no probable cause to believe an offense has been committed or [that Ms. Floris and Mr. Benavides] committed it.'" *United States v. Wilson*, 217 F. Supp. 3d at 172. The government failed to establish: (1) falsity as to most statements; (2) that any false statement was made knowingly; and (3) that any false statement was material.[6]

*1. Falsity – Mr. Benavides' Statements*

The government asserts Mr. Benavides made four false statements[7] during his September 28, 2023 transcribed interview.

i. Government's Charged False Statement 1

| |
|---|
| Q. Are you familiar with the October 14th, 2020, New York Post story regarding Hunter Biden's laptop?<br>A. Only in the – from the prep material. I read through it. |

This is not a false statement. To support its allegation otherwise, the government proffered evidence that Mr. Benavides assisted with the FBI's response to press inquiries on October 14,

[6] The government attempted to add a charge of violating 18 U.S.C. § 1505, obstruction of a Congressional proceeding, in its "Superseding Complaint." Section 1505 requires a finding that the offense conduct was undertaken "corruptly." Aff. of Superseding Compl. ¶ 4, ECF No. 16-2. This is a higher standard than the willfulness standard required under § 1001(a)(2). *See Cisneros*, 26 F. Supp. 2d at 48 (defining "corruptly" under § 1505 to mean "that the defendant influenced someone else to obstruct justice); *see also Moore*, 612 F.3d at 704 (Kavanaugh, J., concurring) (explaining that § 1001 requires "willful" conduct where "willfully 'requires a defendant to have acted with knowledge that his conduct was unlawful.'") (internal quotations and citation omitted). Because the § 1001(a)(2) charge at the lower standard lacks probable cause, the § 1505 charge at the higher standard automatically does as well.

[7] Although the government refers to four statements, each statement consists of multiple questions and answers, which the Court analyzes individually.

2020. *See* Statement of Facts ¶ 14. Specifically, the government cited to:

- an email where someone asked Mr. Benavides and Ms. Floris "Ny post . . . morning answer?";
- an email about "Hunter Biden Laptop" to which Ms. Floris replied, "[Criminal Investigation Division ("CID")] is the point on this matter."
- an instant message from Mr. Benavides indicating that he was tracking "coverage" of the laptop.

The latter two communications do not mention the New York Post story. The single communication that does mention it was an email *sent to* Mr. Benavides. But there is no basis to conclude that Mr. Benavides read that email. Thus, the government offered no evidence to establish that Mr. Benavides was "familiar with" this particular news article.

Moreover, the government tries to ignore the transcript. Here, Mr. Benavides' answer starts with "only in the" but then pivots to "from the prep material. I read through it." The logical reading of this is that Mr. Benavides started his answer with "only in the . . ." but then changed it to: "[I am familiar with the October 14, 2020 New York Post story] from the prep material." No one disputes that the article was in Mr. Benavides' prep material. Thus, his answer was truthful.

Finally, the government cannot rely on ambiguous stream of consciousness mid-answer adjustments to create liability. "The burden [wa]s on the *questioner* to pin the witness down to the specific object of the questioner's inquiry." *Bronston*, 409 U.S. at 360 (emphasis added). If it mattered when Mr. Benavides became familiar with the New York Post article, the questioner should have asked clarifying follow-up questions. *See id.*

| |
|---|
| Q. Do you recall if you were aware of it in October of 2020, when the story came out or shortly thereafter?<br>A. I don't know if I would have gotten it from the story, but I was aware of a Hunter Biden laptop narrative that was out in the public domain in 2020. |

> Q. And, to your understanding, what was that Hunter Biden laptop narrative?
> A. My understanding, and I'll be honest, some of this came from 2 days ago. I was on Wikipedia, anticipating what might be asked. There was a purported laptop dropped off at a repair shop attributed to Hunter Biden.

These are not false statements. Mr. Benavides was being asked if he was aware of "*it* in October 2020." (emphasis added). SA Witt testified that "it" meant the New York Post article. Oct. 29, 2026, Hr'g Tr. 22:24–23:6. However, no one provided that clarification at the hearing. Without defining "it," these questions are "fundamentally ambiguous." *Naegele*, 341 B.R. at 355.

Moreover, Mr. Benavides answered that he "[did not] know" where his knowledge of "it" came from. Mr. Benavides equivocation insulates him from liability. A statement cannot be false when the speaker says they are unsure of the basis for their answer.

Assuming SA Witt is correct, the question asked "Do you recall if you were aware of [the New York Post story] in October 2020", to which Mr. Benavides responded "I don't know if I would have gotten [the New York Post story] from the story, but I was aware of a Hunter Biden laptop narrative that was out in the public domain in 2020." Mr. Benavides' answer does not actually answer the question posed and he begins to discuss a new topic. This disconnect between the question and Mr. Benavides' response highlights that the question was "fundamentally ambiguous." *Naegele*, 341 B.R. at 355. That forecloses liability. *See United States v. Doost*, 3 F.4th 432, 443 (D.C. Cir. 2021) (answer to an "excessively vague" or "fundamentally ambiguous" question may not form the basis of a prosecution for false statement) (quoting *Culliton*, 328 F.3d at 1078.

Mr. Benavides then stated that he was "aware of a Hunter Biden laptop narrative that was out in the public domain in 2020." This is not a false statement. The government offers nothing to dispute that. *See* Oct. 29, 2026, Hr'g Tr. 23:9–24:24.

Finally, the questioner asked about Mr. Benavides' understanding of a "narrative."

Mr. Benavides then explained *his* understanding about a *narrative.* This question is fundamentally ambiguous. The "Hunter Biden laptop narrative" means different things to different people. *See Naegele*, 341 B.R. at 355; *Doost*, 3 F.4th at 443 (same). The questioner never defined these terms, which was his "burden." *Bronston*, 409 U.S. at 360. Also, "[i]n the face of ambiguity, a court may decide as a matter of law to dismiss an indictment [or complaint] so long as the defendant offers an innocent explanation for his testimony." *Culliton*, 328 F.3d at 1080. Such is the case here. Mr. Benavides was asked about the public narrative. His answer offered an innocent explanation: he relied on public information to explain his contemporaneous understanding of the public narrative.

ii. Government's Charged False Statement 2

Q. And, to your knowledge, is the FBI in possession of that laptop?
A. Only because of the Wikipedia article, my understanding is, according to that article, the FBI is in possession of the laptop.

This statement is not false. The questioner asked Mr. Benavides about his present-tense knowledge of the FBI's possession of a laptop. Mr. Benavides' answer was also in the present tense. At the time of his interview, Mr. Benavides was no longer an FBI employee. Thus, he–like any other private citizen–would not know if the "FBI [is] in possession of that laptop." No evidence contradicts this.

Q. So, until a couple of days ago, you didn't know whether the FBI was in possession of the laptop?
A. I was absolutely aware of a narrative that was being discussed about a laptop attributed to Hunter Biden. I don't know when I would have been made aware that the FBI has the laptop or has a laptop. I did see it in the Wikipedia article.

This statement is not false. Mr. Benavides' answer was in the present tense. The questioner did not ask: "So, until a couple of days ago, you didn't know the FBI was *ever* in possession of the laptop?" Mr. Benavides' answer indicates that he learned that the FBI "has the laptop" from public source materials. No evidence contradicts this.

iii. Government's Charged False Statement 3

| |
|---|
| Q. When did you learn that there was an ongoing criminal investigation related to the laptop?<br>A. The Wikipedia page.<br>Q. In prep for today?<br>A. Yes.<br>Q. So you had no knowledge during your tenure at the FBI?<br>A. Of an investigation related to the laptop?<br>Q. Yes.<br>A. No. |

Certain statements here are false.

The first two answers by Mr. Benavides are not false statements. First, Mr. Benavides was asked when he learned of an "*ongoing* criminal investigation." Again, Mr. Benevides did not work for the FBI at that time. So, he would not have any knowledge about whether the FBI had an *ongoing* criminal investigation.

However, Mr. Benavides' final answer was a false statement. The questioner asked, "So you had no knowledge during your tenure at the FBI?," to which Mr. Benavides responded that he had no knowledge of an investigation related to the laptop. The questioner's intervening question changed the inquiry from a present question (i.e., ongoing) to a past question (i.e., during your tenure at the FBI). The government's evidence contradicts his answer.

| |
|---|
| Q. Okay. You mentioned that at some point – I think you said, when you were reading a Wikipedia article, you came to learn that there was an ongoing criminal investigation that related to a laptop?<br>A. I don't recall that from the Wikipedia. I was made aware per the Wikipedia article that the FBI had taken possession of a laptop circa December of 2019.<br>Q. Okay. You didn't have that knowledge from your role in the FBI?<br>A. Absolutely not. |

This is a false statement. The government offered evidence that Mr. Benavides knew about the FBI's possession of the laptop in December 2019 in his role at the FBI.

| |
|---|
| Q. Okay. I just want to clarify, because some of the questions were just so broad and so hypothetical. Like, let's be really specific. Do you have any knowledge that the FBI has an ongoing criminal investigation related to a laptop purported to belong to Hunter Biden? |

A. I do not have firsthand knowledge of that.
Q. Okay. Do you have any knowledge outside of the Wikipedia or media articles that you would have read?
A. No.
Q. Nothing specific to your time in the FBI?
A. No.
Q. And you never had that kind of knowledge, is that fair to say, that was specific to your role in the FBI?
A. In the investigation into a laptop, no.

One statement here is false.

Mr. Benavides' first three answers are not false. The questioner asked about Mr. Benavides' present knowledge: whether the "FBI *has* an ongoing criminal investigation." As noted above, Mr. Benavides did not work at the FBI in September 2023. Thus, he would have no "firsthand knowledge" of whether the FBI has "an ongoing criminal investigation." Additionally, Mr. Benavides would not have knowledge about the FBI's present work from his past experience.

Mr. Benavides' last answer is false. The questioner changed from asking about the present to the past: "never had that kind of knowledge." As noted above, the government offered evidence that contradicted his answer.

iv. Government's Charged False Statement 4

Q. Sure, sure. To your understanding, which division would have had the laptop?
A. Likely the Criminal Division.
Q. Did you have any discussions with anyone from the Criminal Division regarding the FBI's possession of the laptop?
A. I did not.

This statement is false. The government offered evidence of meetings that took place in October 2020 involving both Mr. Benavides and an agent in the criminal division which involved discussions of the laptop.

2. *Falsity – Ms. Floris' Statements*

The government asserts Ms. Floris made four false statements during her July 19, 2023 transcribed interview.[8]

i. Government's Charged False Statement 1

| |
|---|
| Q. Was there ever a discussion at the FITF about Hunter Biden?<br>A. No. At least not with me. And again, there's a whole team below me, so whether or not conversations happened, I don't know, but I personally did not have any conversations.<br>Q. Oh, yeah. No, I understand people can interact and you don't have personal knowledge of that. But just so I drill a fine point on it, as you testified to us today, you have no personal knowledge of Hunter Biden ever being the subject of any discussion at the FITF while you ran that entity?<br>A. Correct. |

These statements are false. The government offered evidence that there were discussions several years prior to Ms. Floris' interview involving Hunter Biden at the FITF.

ii. Government's Charged False Statement 2

| |
|---|
| Q. Did you have any involvement in the Hunter Biden investigation?<br>A. I did not. |

This is not a false statement. Ms. Floris was not involved in the criminal investigation of Hunter Biden. SA Witt conceded that FBI intelligence analysts focused on intelligence activities, which is a different role than FBI agents focused on criminal *investigations*. *See* Oct. 28, 2026, Hr'g Tr. 111:22–112:3; 112:9–113:1. The government's evidence revealed that Ms. Floris believed "CID [Criminal *Investigation* Division] is point on [the Hunter Biden laptop] matter." Statement of Facts ¶ 14. Ms. Floris was not part of CID.

SA Witt conceded that what someone's *involvement* was in anything "would depend on the person's interpretation of what '*involved*' means." Oct. 28, 2026, Hr'g Tr. 116:18–23

[8] Although the government refers to four statements, each statement consists of multiple questions and answers, which the Court analyzes individually.

(emphasis added). When pressed, he revealed that he had "no idea what [Ms. Floris'] interpretation was." *Id.* at 116:24–117:4. This confusion forecloses liability. A "defendant cannot as a matter of law be convicted of [making false statements] on the basis of an answer that is 'excessively vague' or 'fundamentally ambiguous.'" *Naegele*, 341 B.R. at 355; *see Doost*, 3 F.4th at 443 (same).

If this was a material topic, the questioner should have asked more precise questions to begin with or follow-up questions afterwards "to pin the witness down." *Bronston*, 409 U.S. at 360. Alternatively, prior to charging Ms. Floris, the government could have taken the steps they normally do in a § 1001 investigation to understand what Ms. Floris believed her role was in the criminal investigation. This could have been through an interview of her or circumstantial evidence demonstrating what Ms. Floris *believed* she was involved in.

The government's evidence—that Ms. Floris received updates and attended meetings that touched upon Hunter Biden—does not establish that Ms. Floris *believed* that she, as a managerial intelligence analyst, had *involvement* with the criminal *investigation*.

iii. Government's Charged False Statement 3

| |
|---|
| Q. So they focus on this hard drive or the computer that Mr. Guiliani is supposed to be using to influence the election and they use his comments to say he was trying to influence the election and he is buddies with somebody in Ukraine. So how long did the FBI have that laptop prior to the 2020 election, do you know?<br>A. I don't know. I don't know what laptop the article was referring to.<br>Q. It's the one that Hunter Biden left with – and it's referred to in this article – with a computer repairman in Connecticut.<br>A. I – I don't have any details about the laptop. |

These are not false statements. In the first instance, Ms. Floris is being asked about a Daily Beast article which she previously stated she had not read. *See* Oct. 28, 2026, Hr'g Tr. 123:21–125:4. There is no evidence in the record to indicate that Ms. Floris had reviewed the article. SA Witt admitted to this absence of proof. *See id.* at 124:9–13; 125:2–4. Having not read the article makes her statement—"I don't know what laptop the article was referring to"—true.

The questioner then provided Ms. Floris with details about the Daily Beast article that Ms. Floris had not read. Ms. Floris responded that she did not "have any details about the laptop." There is no evidence to dispute this. Moreover, Ms. Floris could not answer questions about an article she had not read, even with more information about that article.

Finally, it is unclear what Ms. Floris meant by "details." This vague answer cannot be a basis for liability. If the question mattered, the questioner should have asked followed up questions to "pin the witness down to the specific object of the questioner's inquiry." *Bronston*, 409 U.S. at 360.

> Q. So let me – let me give you an example. So – and I'm going to use the hypothetical that a Presidential candidate's son has left a laptop in a repair shop, and on that laptop is incredibly damaging material to the President's – that Presidential candidate, or some would say it is damaging. Comes into the hands of the FBI, and somebody else publicly says, you've got the laptop, it's incredibly damaging, and the information is valid and good and belongs to this individual. Are you guys going to – what are you going to do at that point if that – with that laptop?
> A. I can't speak to that, sir, what we would do with that laptop. You know, I don't have any knowledge of said laptop. I can't talk hypothetically about what we would have done or not have done with that laptop.

As a matter of law, answers to hypothetical questions cannot be false statements. A hypothetical calls for speculation that cannot be falsified. *See cf. Doost*, 3 F.4th at 443; *Naegele*, 341 B.R. at 355. The hypothetical posed to Ms. Floris was fundamentally ambiguous which further precludes any liability. *See Doost*, 3 F.4th at 443; *Naegele*, 341 B.R. at 355.

Ms. Floris' refusal to answer the hypothetical further precludes any liability. She specifically stated that she "can't talk hypothetically about what we would have done or not done with that [hypothetical] laptop." That is a true statement. It is also true that she did not—and could not—have knowledge of a hypothetical laptop.

iv. Government's Charged False Statement 4

| |
|---|
| Q. So are you familiar with Senator Grassley and Johnson's joint efforts to investigate Hunter Biden's overseas dealings and any potential connections to then-Vice President Biden?<br>A. Not in any level of detail.<br>Q. But you're familiar they were conducting this investigation?<br>A. Not at that time. I know it now because it's somewhat in the media, but that's the extent of my knowledge. |

These statements are not false. To begin with, context is needed. On September 23, 2020, the Senators publicly released a report of their investigation.

The first question asked if Ms. Floris was familiar as of July 19, 2023 with the Senators' investigation. Her reply was open ended: "Not in any level of detail." Her answer indicates that she has some familiarity, but not detailed knowledge. An answer this vague is not falsifiable. It was a failure of the questioner to not ask a follow-up question about what "detail" meant. *See Bronston*, 409 U.S. at 360.

The government asserts this statement is false based on a September 2020 email Ms. Floris sent with a link to the investigation report along with a "copy-and-paste summary." Oct. 28, 2026, Hr'g Tr. 134:22–135:1. Forwarding an email from nearly three years prior does not establish Ms. Floris was familiar with the investigation in July 2023 (i.e., present knowledge). Ms. Floris' subsequent answers corroborate her lack of detailed knowledge. She later stated she was only familiar with the Senators' investigation "at a high level." *See infra*. Ms. Floris' answers are consistent with having sent a link and a copy and pasted summary years before her testimony. The government offered no evidence that Ms. Floris had detailed familiarity at the time of her interview about the Senators' prior investigation.

The questioner then asked Ms. Floris about her past knowledge. In response, she explained what she knew "at that time." That time being the August 6, 2020 defensive briefing. SA Witt confirmed this context. *See* Oct. 28, 2026, Hr'g Tr. 97:1–7. Thus, Ms. Floris' response was that

"at that time [i.e., August 6, 2020]", she did not know the Senators were conducting an investigation. There is no evidence to contradict this. The government again relies on the September 2020 email to prove falsity. However, evidence of what Ms. Floris learned after August 2020 has no bearing on what she knew in August 2020. And the government offered no evidence from prior to her August 2020 briefing that demonstrated knowledge of the investigation. As SA Witt conceded, the government's dates do not add up. *See* Oct. 28, 2026, Hr'g Tr. 98:15–101:7.

> Q. Were you aware that in August 2019, Senators [sic] Chuck Grassley and Senator Ron Johnson opened an investigation into conflicts of interest involving the Biden family's foreign business ventures while Joe Biden was Vice President?
> A. No.
> Q. Have you since become aware of it?
> A. High level, mainly in this conversation.
> Q. Does that investigation in any way relate to your role at the FBI?
> A. No.

These statements are not false. First, the questioner asked Ms. Floris whether she was aware in the past that the Senators had opened an investigation involving the Biden family. Ms. Floris replied "no." The government offered no evidence about what Ms. Floris knew prior to the September 2020 email. Again, that email cannot retroactively impute knowledge to prior dates. Furthermore, the government offered no evidence that the September 2020 email included information about the Senators opening the investigation in August 2019.

The questioner then asked if Ms. Floris had become aware of the report by the present time, i.e., July 2023. Ms. Floris answered that she was at a "high level." That answer is consistent with her prior answer (above) about lacking detailed knowledge. Forwarding an email nearly three years prior is consistent with high level knowledge. It was a failure of the questioner to not ask a follow-up question about what "high level" meant. *See Bronston*, 409 U.S. at 360.

Lastly, the question "Does that investigation in any way relate to your role at the FBI" is "fundamentally ambiguous." *Naegele*, 341 B.R. at 355. First, it is unclear if that question is asking

about her role as of July 2023. Second, it is unclear what the questioner meant by "relate to" and her "role at the FBI." It was a failure of the questioner to not ask a follow-up question "to pin the witness down." *Bronston*, 409 U.S. at 360. Moreover, the government offered no evidence that Ms. Floris' role at the FBI required her to stay apprised of Senatorial reports of any kind. In fact, during her 2023 interview, Ms. Floris stated and SA Witt confirmed that Ms. Floris "did not rely on congressional staff reports to do her job." Oct. 28, 2026, Hr'g Tr. 138:22–139:2. This "innocent explanation for [her] testimony" is fatal to the charged count. *Culliton*, 328 F.3d at 1080.

> Q. Are you aware that upon concluding their investigation, the staff of the Senate Finance Committee and the Senate Homeland Security and Governmental Affairs Committee issued a report in September of 2020?
> A. No.

This statement is false. Here, this question is about Ms. Floris' knowledge as of July 2023. Ms. Floris incorrectly stated that she was not aware of the report at this time. But the September 2020 email demonstrates that Ms. Floris was aware three years prior that the Senators issued a report.

> Q. Directing your attention to page 5. The second full paragraph, it reads, quote, Hunter Biden was serving on Burisma's board, supposedly consulting on corporate governance and transparency, when Zlo- – [sic] excuse me, Zlochevsky allegedly paid a $7 million bribe to officials serving under Ukraine prosecutor general Vitaly Yarema, to, quote, shut the case against Zlochevsky – excuse me – close quote. Kent testified that this bribe occurred in December 2014, 7 months after Hunter joined Burisma's board, and after learning about it, he and the resident legal advisor reported this allegation to the FBI.
> Did you discuss this allegation in your August 6th briefing with the Senators?
> A. I did not.
> Q. Were you aware of this allegation or have you since become aware of this allegation prior to just now?
> A. No.

This statement is not false. This meandering question is not just fundamentally ambiguous, but also prohibitively confusing. The government recognizes this problem as demonstrated by the fact that it cut a substantial portion of the question in the Complaint. The transcribed question was

105-words with breaks and details; however, the Complaint streamlined it to 73-words. *Compare* Floris Tr. 158:12–24 *with* Statement of Facts ¶ 33. This fundamentally ambiguous and confusing question cannot be the basis for a false statement count. *See Doost*, 3 F.4th at 443; *Naegele*, 341 B.R. at 355.

*3. Knowingly*

The government failed to demonstrate that Ms. Floris and Mr. Benavides were "aware" that that the alleged false statements were inaccurate when they made them. *United States v. Michel*, 2019 WL 5797669, at *2, *14. The government's entire case teeters on brief email exchanges or instant message from nearly three years prior to the Congressional interviews. These communications can establish falsity, but not knowledge. The government offered no evidence or reason to believe that Ms. Floris or Mr. Benavides knowingly gave false statements. Indeed, SA Witt conceded that the investigation did not uncover any emails, text messages, letters, or witnesses that indicated that Mr. Benavides intended to lie to Congress. *See* Oct. 27, 2026, Hr'g Tr. 106:22–107:24. Additionally, SA Witt testified that there was "[n]othing explicit in the complaint" about why Ms. Floris would have made false statements. Oct. 28, 2026, Hr'g Tr. 160: 4–9.

At bottom, the alleged false statements were "merely the result of confusion, mistake, faulty memory, or another innocent reason." *Libby*, 429 F. Supp. 2d at 12. Faulty memory is particularly applicable here. The questions asked during the 2023 interviews related to knowledge Ms. Floris and Mr. Benavides held from approximately three years prior. "[H]uman memory has its frailties and th[e] recollection of exact dates of events that transpired many years previously is apt to be inaccurate and unreliable." *Schering Corp.*, 101 F. Supp. at 573. That is especially true here considering that at the time of their interviews, Ms. Floris was no longer at the FITF and

Mr. Benavides was no longer at the FBI. *See* Statement of Facts ¶ 6; Oct. 27, 2026, Hr'g Tr. 90:11–13. On top of that, as SA Witt acknowledged, Ms. Floris and Mr. Benavides were extraordinarily busy during the years prior. For instance, SA Witt testified that his team reviewed "hundreds of thousands of communications" from Ms. Floris and that it was "[t]otally possible" that she supervised 200 to 300 employees. Oct. 28, 2026, Hr'g Tr. 59:18–60:10; 65:19–23. Additionally, SA Witt confirmed that Mr. Benavides "essentially wore two hats" in late 2020 while he was employed as section chief of FITF. Oct. 27, 2026, Hr'g Tr. 103:5–18. The volume of the communications Ms. Floris and Mr. Benavides received explains why they "had a faulty memory about the conversations [they] had with [FBI colleagues]," which in turn "negat[es] the specific intent element of the charged offenses." *Libby*, 429 F. Supp. 2d at 13. The government cannot use a needle from a haystack of communications to crucify Ms. Floris and Mr. Benavides.

The government's only circumstantial evidence of knowledge was SA Witt's assumption that conversations about Hunter Biden's laptop would "be something that [Ms. Floris and Mr. Benavides] would not easily forget." Oct. 28, 2026, Hr'g Tr. 126:2–6. But SA Witt's unsubstantiated belief that someone *should* remember something from years prior is insufficient to establish by probable cause that Ms. Floris and Mr. Benavides knowingly made false statements. Indeed, SA Witt's errors in his own testimony demonstrate how easy it is to forget something important. In an investigation for which he had to answer to the highest levels of the government, SA Witt still misstated conversations from only days/months ago. *See* Oct. 29, 2026, Hr'g Tr. 12:25–13:8. The Court chalks up SA Witt's mistakes to confusion and bad memory, just as it does for Ms. Floris and Mr. Benavides. Just as SA Witt concluded about his own misstatements, any misstatement of Ms. Floris and Mr. Benavides was "not an intentionally false statement." Oct. 27, 2026, Hr'g Tr. 84:8–22.

Alternatively, the government could have established knowledge by offering circumstantial evidence of a motive to lie. *See Lighte*, 782 F.2d at 373. But the government failed to do so. *See supra*. That is because there was no motive for Ms. Floris or Mr. Benavides to lie to Congress. Ms. Floris and Mr. Benavides did not have a reason to interfere with the already full-throttle Congressional investigation into Hunter Biden's laptop. There was no benefit Ms. Floris or Mr. Benavides received by making the allegedly false statements. Nor did Ms. Floris or Mr. Benavides have anything to cover up.[9] Their lack of a motive for lying is particularly evident given that Ms. Floris and Mr. Benavides have spent a lifetime upholding their oath to support and defend the Constitution. There is no reason to believe Ms. Floris and Mr. Benavides would abandon that commitment when they voluntarily testified before Congress.

Perhaps without the pressure to rush to charge, SA Witt would have been able to pursue evidence "to understand [Ms. Floris' and Mr. Benavides'] mindset and [their] understanding in [their] answers." *Id.* at 142:21–25. But getting to the truth interfered with the rush to charge. And the motive for that is clear: to appease President Trump in his campaign of retribution against the FBI and to score cheap political points to impact the midterm elections.

*4. Materiality*

The government cannot establish materiality without evidence that the false statements had the "capability to [] influence" "an actual decision at issue before the agency." *Tao*, 107 F.4th at 1184–85. Agency testimony is often helpful to an assessment of materiality. For example, the court in *Gaudin* concluded that "[o]ne cannot look at a particular law or a particular statute or regulation

[9] Compare this with Transcript of Proceedings 26:22–28:12, *United States v. Cohen*, No. 18-cr-850 (S.D.N.Y. Dec. 12, 2018), ECF No. 13. There, Michael Cohen admitted to a motive to lie: "to be consistent with [President Trump's] political messaging and out of loyalty to [President Trump]." *Id.*

to determine what would affect the decision of the [Department of Housing & Urban Development] to insure [a federal] loan. False statements of age, address, gaps in employment history, or inaccuracies in a financial statement may be of no importance to some agency determinations but crucial to others." 28 F.3d at 950. Similarly, a "reasonable" fact finder could not likely assess how a statement might impact a congressional investigation. *Cisneros*, 26 F. Supp. 2d at 40–41; *see* Oct. 29, 2026, Hr'g Tr. 165:3–166:12. For that reason, the government offered direct evidence of materiality in the form of a six-page letter from Steve Castor, General Counsel for the Republicans of the HJC in answer to the Questionnaire.[10] *See* Oct. 28, 2026, Hr'g Tr. 165:2–11; *see also* Benavides Ex. 4 ("Castor Letter"). As the government conceded, they could not establish materiality without the Castor Letter. *See* Oct. 29, 2026, Hr'g Tr. 163:8–165:2. The problem is that the letter is specious.

i. The Castor Letter is Not Credible

Mr. Castor's conclusions about why the alleged false statements were material to the HJC fall into four buckets: (1) the answers impacted potential follow-up questions from the HJC, (2) the answers affected the documents sought by the HJC, (3) the answers influenced how later interviewees were questioned; and (4) the answers impacted the subsequent impeachment inquiry of President Biden. All of this assumes that the Committee was actually considering what Ms. Floris and Mr. Benavides said vis-à-vis Hunter Biden's laptop and that the Committee's related inquiry could have gone in more than one direction. But we know that not to be the case.

Congressional investigations are very different than criminal investigations. Congressional investigations are typically public and are not subject to grand jury secrecy rules. Consequently,

[10] SA Witt conceded that the investigation team failed to ask or receive input from HJC Democrats regarding materiality of the interviews. *See* Oct. 28, 2026, Hr'g Tr. 228:24–230:13. Again, the rush to charge trumped the pursuit of truth.

unlike with law enforcement, Congressmembers may give direct insight in real time as to the impact of testimony on the agency and their assessment of a witness. In turn, it is appropriate for courts to consider their statements. *See, e.g.*, *State of New Mexico v. United States*, 831 F.2d 265, 268 (Fed. Cir. 1987) (explaining that Senator statements can be a "reliable indication of congressional intent"); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 150 (D.D.C. 2025) (highlighting how President Trump's Truth Social posts support a finding that the Administration targeted Perkins Coie); *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 131, 134–75 (D. Mass. 2025) (public statements and social media statements in part supported a finding that the Secretary of Homeland Security and Secretary of State intended to cause fear and deport individuals in violation of the First Amendment). The question being whether their public statements call into question their official assertions.

Here, "numerous government officials spoke publicly and contemporaneously on these issues, including about their motivations, and those statements are flatly inconsistent with what [the government] now contend[s]." *President & Fellows of Harvard Coll. v. United States Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 122 (D. Mass. 2025). First, Representative Jordan and Senators Grassley and Johnson stated several times they generally believed the FBI to be biased and corrupt. *See supra* Part I.C. For example, on January 29 and May 18, 2023, Representative Jordan accused the FBI of widespread corruption and political bias. *See id.* On September 25, 2024, Representative Jordan again accused the FBI of being driven by politics. *See id.* Second, they made these same allegations specific to the FBI's involvement with Hunter Biden and his laptop. For example, on July 27, 2022, Senator Johnson stated that the "FBI can no longer be trusted to investigate Hunter Biden with integrity and the equal application of law." *Id.* On August 25, 2022, Senator Johnson stated that "the FBI cannot be trusted with the handling of

Hunter Biden's laptop." *Id.* On February 8, 2023, Representative Jordan criticized the FBI for how they handled the laptop. *See id.* On February 10, 2025, Senator Grassley and Representative Jordan stated that "political infection" in the FBI raised concerns about "the FBI's [FITF] engaging in political influence, rampant whistleblower retaliation and other politically-infected conduct by the DOJ and FBI." *Id.* Third, the Congressmembers stated on multiple occasions that they could not be stopped from continuing their investigation into Hunter Biden and his laptop. For example, on October 20, 2022, Senator Grassley stated "we just have to keep pursuing [information about Hunter Biden], and I intend to keep pursuing it." *Id.* He also stated that he "want[ed] the Justice Department, the FBI, to know that we know these documents exist" and that he intended to "keep the heat on until I get answers." *Id.* On June 21, 2023, Senator Grassley stated that his investigation would continue despite Hunter Biden's plea deal. *See id.* That their investigation continued full throttle is evidenced by the February 6, 2024, lawsuit filed by the HJC against FBI Assistant Special Agent in Charge Elvis Chan relating to his work at FITF and his firsthand knowledge of the FBI's actions regarding the 2020 New York Post stories about Hunter Biden's laptop. *See id.*

In sum, the Congressmembers were not actually considering what the witnesses had to say. The Congressmembers were clear that they would not believe FBI witnesses when it came to Hunter Biden's laptop. Furthermore, the Congressmembers stated they would go forward with their investigation no matter what happened. And this is in fact what happened. As recently as September 2, 2026, Representative Jordan sent a letter to Director Patel demanding additional information and documents regarding the FITF's work in 2020. *See id.* The Hunter Biden

investigation was (and is) an unstoppable juggernaut. Ultimately, reality trumps the hypothetical answers created by the Castor Letter.[11]

Compare this with other examples of Congressional investigations and how lies derailed them. For example, in *United States v. Stone*, the House Permanent Select Committee on Intelligence asked Roger Stone to appear and produce documents. *See* 394 F. Supp. 3d at 8. Roger Stone's "emails, [] text messages, [and other] documents" were the subject of the congressional investigation. *United States v. Stone*, Transcript of Jury Trial at 264:10–14; 265:17–24 (D.D.C. Nov. 6, 2019) (No. 19-cr-18). When testifying before the committee, Roger Stone denied that he possessed these documents and "attempted to prevent another person from contradicting the allegedly false account he had provided to the Committee." *Stone*, 394 F. Supp. 3d at 8. However, Stone did personally possess and had primary access to these communications. Transcript of Jury Trial at 265:17–24; 272:14–275:20.[12] His lies impacted the committee's ability to get these essential documents. Conversely, Ms. Floris' and Mr. Benavides' case involves them incorrectly remembering stale information possessed by others and involved no documents in their possession. It is unfathomable how anything they said about these topics mattered to the HJC.

ii. The Specific Assertions of How the HJC was Affected are Implausible

The government does not articulate what "actual decision at issue before the agency" the allegedly false statements had the capability to influence. *Tao*, 107 F.4th at 1184–85. Ms. Floris

[11] The simple way the Congressmembers could have avoided these problems was to focus on the investigation instead of making bellicose public statements. Had the Congressmembers not made such statements, the government could have credibly suggested that Ms. Floris' and Mr. Benavides' statements impacted the HJC's decision to seek additional documents and testimony.

[12] Notably, in *Stone*, the grand jury found probable cause that Roger Stone impeded the committee's work. *See* 394 F. Supp. 3d at 7–8. The Court welcomes the government to seek a similar grand jury finding here.

and Mr. Benavides were asked to voluntarily appear before the HJC to discuss the August 6, 2020 defensive briefings provided to Senators Grassley and Johnson. The Castor Letter confirms that a focus of Ms. Floris' interview was the defensive briefing and states that "the Committee specifically noted its interest in questioning Mr. Benavides about the defensive briefing." Castor Letter at 1, 5. From this framing, the Court interprets that the "actual decision at issue" related to the HJC's inquiry into how the defensive briefing may have impacted the Senators' broader investigation into Hunter Biden. *Tao*, 107 F.4th at 1184–85. There is no credible allegation that either Ms. Floris or Mr. Benavides provided a false statement about details of the defensive briefing. *See Naegele*, 341 B.R. at 357 (when considering false statement, court looked to the purpose of the forms to understand the context of the proceeding and statements).

Even assuming the Hunter Biden laptop investigation was part of the HJC's decision, nothing Ms. Floris and Mr. Benavides said mattered to that decision. Ms. Floris and Mr. Benavides did not possess Hunter Biden's laptop, they did not run the Hunter Biden investigation, and contemporaneous evidence shows that they lacked much detail about the investigation. *See, e.g.*, Statement of Facts ¶¶ 14, 16, 18 (contemporaneous evidence shows Ms. Floris and Mr. Benavides asked questions about the Hunter Biden laptop and investigation as they did not know the details themselves, and stated that CID was leading the investigation). Many of the allegedly false statements relate to general awareness of news reports and congressional documents, timing of knowledge, or public narratives. This testimony was not and could not be material to the HJC's investigation, especially considering many of the questions related to matters of public knowledge.

As noted above, the Castor Letter attempted to provide examples of how the interviews of Ms. Floris and Mr. Benavides were material to the HJC. Mr. Castor's responses about how the interview answers were material to the HJC fall into four main buckets: (1) the answers impacted

potential follow-up questions from the HJC, (2) the answers affected the documents sought by the HJC, (3) the answers influenced how later interviewees were questioned; and (4) the answers impacted the impeachment inquiry.

The first bucket is circular logic. A finding by this Court that materiality can be satisfied through an assertion that false statements derailed follow-up questions would render the materiality element meaningless. Questions, if answered differently, would always lead to different answers and in turn different questions. Thus, without more, materiality cannot be satisfied by an allegation that the Committee would have asked follow-up questions.

Second, the Castor Letter asserts that if Ms. Floris had answered differently, the HJC would have: "aggressively pursued all relevant information about [communications involving FITF, the FBI Baltimore office, and U.S. Attorney's Office]" and "prioritized the production of relevant communications and documentation . . . from the [DOJ]." Castor Letter at 2. Similarly, the Castor Letter indicates that if the HJC had received different answers from Mr. Benavides, the Committee "would have obtained additional documents . . . from the Executive Branch." *Id.* at 6. However, the subsequent actions of the HJC undermine this assertion. The Committee continued to aggressively seek documents and information from the FBI related to Hunter Biden. For example, on August 17, 2023—after Ms. Floris' interview—Representative Jordan sent a letter to FBI Director Wray[13] to follow up on document requests and in which Representative Jordan stated that a recent document production was "woefully inadequate and omit[ted] voluminous responsive material, including communications between FBI and tech companies, internal communications, and communications between FBI and other executive branch entities." Jim Jordan, Chairman, H. Comm. on the Judiciary, Letter to Hon. Christopher Wray, Dir., Fed. Bureau of Investigation (Aug.

[13] This letter is cited in the Castor Letter at footnote 13.

17, 2023), https://perma.cc/R5RX-MQ5G. Shortly thereafter, Representative Jordan "demand[ed] documents from Hunter Biden probe." The Hill, *Jordan demands documents from Hunter Biden probe, interview with top prosecutor* (Sep. 18, 2023), https://perma.cc/4NLE-FW6C.

Furthermore, for years thereafter, the HJC continued pursuing documents from the FBI and the FITF related to Hunter Biden. *See, e.g.*, Jim Jordan, Chairman, H. Comm. on the Judiciary, Letter to Hon. Christopher Wray, Dir., Fed. Bureau of Investigation (Mar. 11, 2024), https://perma.cc/9GKR-GBR3; Jim Jordan, Chairman, H. Comm. on the Judiciary, Letter to Hon. Kash Patel, Dir., Fed. Bureau of Investigation (Feb. 24, 2025), https://perma.cc/K2EZ-AU6H. Given this context—that the HJC continued pressing the FBI for documents and information related to Hunter Biden—the Court cannot conclude that any answers provided by Ms. Floris or Mr. Benavides about their knowledge of news stories, congressional reports, or hypothetical situations materially impacted the Committee's choice to request documents. *See, e.g.*, Washington Examiner, *House Republicans sue FBI agent for bucking censorship investigation* (Feb. 6, 2024), https://perma.cc/KG5U-WYQ3; Jim Jordan, Chairman, H. Comm. on the Judiciary, Letter to Hon. Kash Patel, Dir., Fed. Bureau of Investigation (Sep. 2, 2026), https://perma.cc/R65E-ZZSX.

Third, the Castor Letter states that if Ms. Floris or Mr. Benavides had provided different answers, then the HJC would have questioned later witnesses about certain communications or sought testimony about certain topics. *See* Castor Letter at 2, 6. The facts in this very case repudiate that. Even after the HJC interviewed Ms. Floris' in July 2023, the Committee still interviewed Mr. Benavides months later and asked him questions about the same topics. Moreover, in subsequent interviews the HJC continued to ask about the Hunter Biden investigation. *See, e.g.*, Transcribed Interview of Special Agent in Charge, Thomas Sobocinski ("Sobocinski Tr.") (Sep. 7, 2023), https://perma.cc/E279-Y69S; Transcribed Interview of Assistant Special Agent in Charge,

Ryeshia Holley ("Holley Tr.") (Sep. 11, 2023), https://perma.cc/L2SG-TE33. Answers from these interviews corroborate that Ms. Floris and Mr. Benavides were not relevant to the Hunter Biden investigation. For example, in Mr. Sobocinski's interview, the HJC asked questions about who at the FBI provided updates related to Hunter Biden. Mr. Sobocinski stated that the "case was managed out of our [CID]." Sobocinski Tr. 13:1–17:19. The HJC continued their investigation unabated. The Castor Letter's glib conclusions offer nothing as to how the allegedly false statements of Ms. Floris or Mr. Benavides impacted later witness questioning.

Fourth, the assertion that Ms. Floris' or Mr. Benavides' interviews impacted the impeachment inquiry is nonsensical. The House of Representatives voted to open an impeachment inquiry into then-President Biden after the alleged false statements. As part of the impeachment inquiry, the House of Representatives interviewed several witnesses and officials with personal knowledge and involvement in the Hunter Biden investigation. *See* Press Release, H. Comm. on the Judiciary, *Judiciary Committee Releases David Weiss and Other Transcripts Relating to DOJ's Hunter Biden Investigation* (Jan. 15, 2025), https://perma.cc/A9NY-EZSZ. Again, the Castor Letter offers no detail as to how Ms. Floris' and Mr. Benavides' statements impacted the impeachment of the then-President. This is particularly damning as to materiality for Mr. Benavides because the Castor Letter's materiality discussion for Mr. Benavides' statements relates almost exclusively to the impeachment inquiry.

iii. The Castor Letter Relies on Assumptions and Misleading Summaries

The investigation team was "not allowed to interview" the HJC. Oct. 27, 2026, Hr'g Tr. 59:4–13. This despite the fact that the HJC was the "victim" of the alleged false statements and that the HJC staffers were necessary witnesses to explain materiality. SA Witt testified that it was not "typical" in an investigation to be barred from interviewing witnesses. *Id.* at 59:8–61:1.

Instead, the investigation team was limited to submitting the Questionnaire to Mr. Castor. The Questionnaire asked Mr. Castor how the alleged false statements impacted the HJC. The problem is the questions did not quote the testimony of Ms. Floris and Mr. Benavides. Instead, the investigation team provided a summarized, mischaracterization of Ms. Floris' and Mr. Benavides' statements. *See* Castor Letter at 1–6. And despite SA Witt's affirmation that every answer must be viewed in the context it was given, the government's sole basis for materiality did not include any context. *See* Oct. 29, 2026, Hr'g Tr 25:6–8; *see also* Castor Letter at 5–6.

For example, in question 4, the investigation team stated that "Ms. Floris testified that she did not know about the Hunter Biden laptop. *E.g.*, Tr. 94:3–15, 95:24–96:8." Castor Letter at 3. This was incorrect. In her testimony at the cited pages, Ms. Floris actually stated that she did not know details about a laptop discussed in a Daily Beast article which she had not read and that she did not have details about a hypothetical laptop. *See* Floris Tr. 94:3–15, 95:24–96:8. Mr. Castor's response thus relies on a mischaracterization of Ms. Floris' testimony. As another example, question 8—the only question the investigation team asked about Mr. Benavides[14]—was "maybe a summary purporting to [be] the substance of the transcript." Oct. 29, 2026, Hr'g Tr. 21:17–22:3. In question 8, the investigation team stated that Mr. Benavides "testified that he was only familiar with the FBI's purported possession of a laptop reportedly associated with Hunter Biden from a Wikipedia article he reviewed in preparation for the interview. *E.g.*, Tr. 146:20–147:1." Castor Letter at 5. This was incorrect. In the cited portions of the testimony, Mr. Benavides testified that he only had *current* knowledge about the FBI's possession of a laptop via a Wikipedia article. *See*

[14] The Castor Letter only references Mr. Benavides' statements which the government alleges are false statements #2 and #3. *See* Castor Letter at 5; Benavides Tr. 146:20–147:1 (referencing part of the government's alleged false statement #2); *see also* Castor Letter at 5; Benavides Tr. 171:19–25 (referencing part of the government's alleged false statement #3). The government provided no evidence in the Castor Letter or otherwise to support the materiality of statements #1 or #4.

Benavides Tr. 146:20–147:1. A simple way to avoid these inaccuracies would have been for the investigation team to use the actual testimony in the Questionnaire. But that would not have served the government's desire to get answers that supported their rush to charge.

The Castor Letter concludes based on the mischaracterized summary and assumptions that Ms. Floris' "failure to be candid would have denied the Committee the ability to pursue relevant documents and testimony on the FITF's actions in relation to the Hunter Biden laptop matter, which also factored into the House of Representative's impeachment inquiry that opened two months after." Castor Letter at 3. Despite three years having passed since the alleged false statements, this is largely all the government could come up with. To describe this as bare boned is too generous.

An additional problem exists with relying on the Castor Letter to establish materiality for Mr. Benavides: Mr. Castor was not present for Mr. Benavides' September 2023 interview. *See* Oct. 27, 2026, Hr'g Tr. 80:9–81:2. Nor does it appear that anyone at the HJC read the transcript of his interview before Mr. Castor answered the Questionnaire. *See id.* at 81:20–82:5. The career prosecutors conceded during a recorded conversation that this was a huge mistake because the investigation team had "to speak with one of the five officials that was in the Benavides [] transcribed interview." Oct. 29, 2026, Hr'g Tr. 11:1–10, 15:15–20 (cleaned up). The career prosecutors were right. This alone nullifies the Castor Letter as to Mr. Benavides.

Thus, the facts before this Court do not support a finding that the statements were material.

C. Consequences of the Failed Prosecution

The stain this prosecution leaves on the good names of Ms. Floris and Mr. Benavides is incalculable. No matter what they do, they will never be able to escape their names being

associated with this slapdash, politicized attack on them.[15] Indeed, despite the Court dismissing the case three weeks ago, the Department of Justice and Senator Grassley have kept their press releases on their websites celebrating the now-failed Complaint. *See* Press Release, U.S. Attorney's Office, District of Columbia, *Two Former FBI Officials Charged in Lying to Congress about Hunter Biden Investigations* (Oct. 23, 2026), https://perma.cc/8UXR-WTBS; *see also* Press Release, S. Comm. on the Judiciary, *Grassley Statement on Former FBI Officials Charged with Lying to Congress* (Oct. 23, 2026), https://perma.cc/KF32-NFXM. These press releases have incorrect statements in them given the findings of this Court and the government's own admissions about the errors in the Complaint. Yet the government has taken no action. Contrast this with the government's attempt to rewrite history by taking down the press releases it issued related to the successfully prosecuted January 6th cases. *See* TIME, *Justice Department Removes News Releases on Jan. 6 Prosecutions From Website: 'Partisan Propaganda'* (May 25, 2026), https://perma.cc/ZN73-JNUC.

The harm from this prosecution is not limited to Ms. Floris and Mr. Benavides. Current FBI staff believed this case to be a witch hunt. *See* Oct. 27, 2026, Hr'g Tr. 127:24–128:4. The takeaway for FBI staff is to be afraid. They are one tweet away from being prosecuted by their own government. The harm from this weaponization is metastasizing from current staff to future recruits. What sane person would join the FBI, particularly in the national security branch, under these circumstances? Starving the FBI of talented agents and analysts is a grave risk to our national security. The "FBI's responsibilities as the lead intelligence and law enforcement agency in the

[15] Though it may be a small consolation, Ms. Floris and Mr. Benavides may file a request in this matter to expunge their arrest record. *See United States v. Butler*, No. 25-cr-256-1, 2026 WL 3448603 (D.D.C. Nov. 12, 2026).

nation to detect, deter, and disrupt national security threats to the United States and its interests." U.S. Dep't of Justice, FBI, *Federal Bureau of Investigation: National Security Branch* (last visited Nov. 22, 2026), https://perma.cc/53ND-LMV3.

This prosecution also has a chilling effect on Congressional testimony. No wonder witnesses now invoke their 5th Amendment privilege against self-incrimination when testifying before Congress. *See, e.g.*, NPR, *Anthony Fauci invokes Fifth Amendment at tense Senate hearing* (July 29, 2026), https://perma.cc/5D47-83CS. Had Ms. Floris and Mr. Benavides simply invoked their 5th Amendment rights, the government likely could not have dragged them into court. But this comes at a cost. Congress will lose its ability to investigate as more and more witnesses refuse to answer their questions. *See* Olivia O'Hea, Note, C*ongress, the Constitution, and the Fifth Amendment Communist: A Proposal for Pleading the Fifth in a Congressional Investigation*, 33 Geo. J. Legal Ethics 735, 743–48 (2020) (calling witnesses who will invoke their Fifth Amendment Rights turns hearings into political theater while yielding no factual information).

Finally, the public has suffered from this case. This case is not a one-off mistake. This court has seen a line of botched, politicized cases where the government has rushed to charge cases, only to have them fall apart. *See United States v. Beidleman*, 806 F. Supp. 3d 11, 12 (D.D.C. 2025) (cataloging cases where prosecutors rushed to charge "before properly investigating"). These failures have come at a historic rate. *See United States v. Riley*, 806 F. Supp. 3d 38, 48 (D.D.C. 2025) (during an eight-week period of the federal surge in D.C., the government moved to dismiss 21% of all cases charged by criminal complaint. In contrast, the government had dismissed approximately 0.5% of cases charged by criminal complaint over the prior ten years.). The Department of Justice still lists "Independence and Impartiality" first among its values, stating it "work[s] each day to earn the public's trust by following the facts and the law wherever they

may lead, without prejudice or improper influence." U.S. Dep't of Justice, *About DOJ*, *Our Values* (last visited Nov. 22, 2026), https://perma.cc/4422-Y64C. This prosecution is a betrayal of these values. The slapdash prosecution of Ms. Floris and Mr. Benavides in response to a public command from the President demonstrates a lack of independence and impartiality from the political desires of the Administration. Moreover, the rampant errors and misstatements stemming from the slapdash nature of this investigation and prosecution further undercuts public confidence in the work of the Department of Justice. If a high-profile case like this is so poorly executed, what can the public expect in the run-of-the-mill case with far less resources and oversight. The erosion of public confidence in the Department of Justice further harms public safety. As the Department of Justice recognizes, "[b]uilding trust with the community is fundamental to safe and effective policing." U.S. Dep't of Justice, Office of Community Oriented Policing Services, *Building Trust* (last visited Nov. 22, 2026), https://perma.cc/BMJ8-KX7J.

## IV. CONCLUSION

For years, the Administration has treated the weaponization of law enforcement like a horror movie villain coming for them. Now the threat is finally real. Only the call is coming from inside the house—the White House. Perhaps, less time on the pool and more on reflecting.

Zia M. Faruqui Digitally signed by Zia M. Faruqui Date: 2026.11.24 12:05:03 -05'00'

HON. ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE